Daniel B. Olmos, Esq. (CA SBN: 235319)



NOLAN
BARTON
OLMOS &
LUCIANO LLP

600 University Avenue
Palo Alto | CA | 94301
T 650.326.2980 | F 650.326.9704
dolmos@nbo.law

Attorney for Defendant
JOSEPH MOLLICK

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES<br><br>        Plaintiff,<br><br>   v.<br><br>JOSEPH ANDREW MOLLICK,<br><br>        Defendant. | Case No.: 3:21-CR-00452 VC<br><br>**SENTENCING MEMORANDUM**<br><br>Date:    May 24, 2023<br>Time:   1:00 p.m.<br>Dept:   Hon. Vince Chhabria |

Defendant Joseph Mollick, through counsel, respectfully submits this Sentencing Memorandum to assist the Court with respect to the May 24, 2023, sentencing hearing in this matter. Mr. Mollick requests that the Court take into consideration this memorandum in determining a reasonable, just, and appropriate sentence in this case.

### I.    Procedural History

Mr. Mollick is charged by Indictment with a single count of violating 18 U.S.C. § 2252(a)(4)(b) and (b)(2) (possession of child pornography), as well as a forfeiture allegation pursuant to 18 U.S.C. § 2253(a) related to the contraband material and the digital media which contained it. On January 9, 2023, Mr. Mollick pled guilty to the single count pursuant to a plea

agreement.  That plea agreement set a Total Offense Level of 28 and permits Mr. Mollick to argue at sentencing for a downward variance based upon the statutory factors set forth in 18 U.S.C. § 3553(a).

## II.        Social History

### a.   Early Life and Upbringing

Joseph "Joe" Mollick was born September 5, 1962, in Dallas, Texas.  His mother Margaret was, and remains, a fervent liberal.  Joe describes his father, John, as having been quite the opposite, a "red Republican" and mechanical engineer who worked as a defense contractor. Margaret and John met through a Catholic church club and together raised three sons, of which Joe is the middle child.

When Joe was about two years old, his family moved from Texas to Bloomfield Hills, Michigan, a suburb north of Detroit.  There, Margaret became very involved in the Catholic church.  She brought Joe and his brothers to services every week, and Joe served for a time as an altar boy.  Joe also attended the Catholic Traub Elementary School and East Hills Junior High School until his family moved back to Texas in 1977.  Joe recalls his family's time in Michigan before the move as generally positive and his home life as mostly stable, despite his father's heavy drinking habit.

Moving into a new home in the city of Arlington between Dallas and Fort Worth, Joe was enrolled in the public James Bowie High School.  A gifted student, he continued to excel in his courses as he got used to the larger class sizes, and eventually graduated as salutatorian.  Excited to head back north, Joe left Texas for Northwestern University in Evanston, Illinois after graduation.

### b.  Science and Medical Education

When Joe arrived at Northwestern, he knew that he loved science and especially research but worried about turning his passion into a career with a predictable income.  As such, he decided to pursue both science and medicine, earning an undergraduate degree in Biochemistry as well as Molecular and Cellular Biology.  For graduate school, he applied to MD-PhD programs and

**SENTENCING MEMORANDUM**
**CASE NO. 3:21-CR-00452**

accepted an offer of admission from Baylor College of Medicine in Houston where he received in-state tuition.

Joe describes his years at Baylor pursuing his PhD in Microbiology & Immunology as the happiest of his life.  Researching toxic shock syndrome and food poisoning through the lens of the immune system, Joe and his team were getting significant results.  He was learning things about super antigens and the immune response that no one had ever known before.  Publishing papers every six months or so, Joe reveled in the thrill of discovery.

After completing his dissertation and MD program in 1994, Joe was accepted as a medical intern and then resident at Massachusetts General Hospital in Boston.  It was a grueling two years of long shifts and demanding schedules.  When he completed the required hours, Joe knew he likely should have pursued a medical fellowship but missed the lab too much.  Joe followed his interests and was hired as a research fellow at the Dana Farber Cancer Institute in Boston.

### c.  Disappointments in Pursuit of Research Career

When Joe was heading to Dana Farber in 1996, there was excitement in the field about the potential of using the immune system to treat cancer.  Joe personally felt this excitement and also had an idea of himself as someone with the "magic touch," a kind of special something that brought about amazing results in the lab.  With this confidence and a K08 Mentored Clinical Scientist Research Career Development Award from the NIH to cover his research and income for five years, Joe believed that he was ready to make a difference.

On arrival, Joe's mentor at Dana Farber presented him with a paper from a recent post-doctoral fellow that supposedly had yielded exciting results.  Joe's job was to re-create those results in the lab.  For almost three years, Joe found no success and began to suspect that the published results were wrong at best, or fraudulent at worst.  He approached his mentor with these concerns but was told to just move on to another project.  This did not sit right with Joe.  If the paper was wrong, it should be retracted.  Not long after, an outside investigation revealed that the paper had indeed been fraudulent.  Joe was shocked and saddened that the institute had not retracted the results earlier.  Before, he had considered research coming out of Boston as the best

**SENTENCING MEMORANDUM**
**CASE NO. 3:21-CR-00452**

of the best and the information in journals as truth.  Now those beliefs and three years of his life were gone.  It challenged his perception of science.

Joe stayed on at Dana Farber for the remainder of his K08 grant and published just one paper during that time.  In 2001, he left Boston and travelled to Stanford where he had been accepted as an oncology fellow.  For three years, he practiced and learned to care for cancer patients, most of whom were suffering from breast cancer.  Though he knew it was important work, he had a difficult time with the fact that cancer was managed rather than cured.  He felt driven to get back into the lab to look for better options.  In 2004, he won a K22 Career Transition Award from the NIH that allowed him to work as a funded research fellow at Stanford for three years.

With his own lab in place, Joe set out to study and test the possibility of using the allergic immune response to fight cancer.  In Joe's novel approach, he was inspired by his mentor at Baylor who was an allergist and his own experiences as an oncologist.  Others in the community, however, were unsure.  The allergic immune system is not as well understood, and some doctors worry about anaphylaxis.  Joe was undeterred.  Using mice, he isolated their antibodies then modified them to become human-like antibodies with the ability to bind with breast cancer cells and trigger an allergic response to tumors that not only appeared to destroy the tumor but prevent metastasis from occurring.

Working without a support network or backing from other researchers, Joe was under stress but still confident, and by the end of his three-year grant had produced promising results. Joe wanted to continue his research but was told by Stanford that he needed to find his own funding or move on.  Joe applied to the NIH but, with the war in Iraq, very few awards were being granted.  After the maximum two tries, Joe was turned down.  Devastated, he could not bring himself to destroy all of his work.  To this day, he maintains a storage room for some of the equipment from the lab.

Forced to head in a new direction, Joe returned to working directly with cancer patients. He hoped that maybe Stanford would eventually grant him as assistant professorship or lab but, as

SENTENCING MEMORANDUM
CASE NO. 3:21-CR-00452

the years passed, it became clear that this was not going to be the case. Not paid particularly well by Stanford, Joe had been working on the side as a hospitalist at Seton Medical Center in Daly City. In 2013, Joe decided to leave Stanford and take up his work as a hospitalist full-time.

### d. Hospitalist Career and Difficulty Letting Go

As a hospitalist managing in-patient cases at Seton Medical Center, Joe enjoyed having a higher income and the feeling he could make more of a difference than he had while administering chemotherapy. In 2016, he transitioned to St. Mary's Medical Center in San Francisco and, the following year, added shifts at Kentfield Long Term Acute Care Unit. He worked 12-hour shifts typically in a five-day on/five-day off, or a ten-day on/ten-day off rotation.

Joe threw himself into his work, both to take his mind off the research he wished he was doing and also to increase his wealth. Despite growing up middle class without financial trouble and making a substantial income at the time, he could not stop worrying about money. It was surprising then, that Joe did not mind when his salary was cut in half in 2018 after UCSF took over St. Mary's Medical Center. The reason for Joe's indifference about his salary decrease was that the takeover brought with it the potential to rekindle his research ambitions.

As Joe waited for a chance to maybe get back into the lab, he rested his hopes on a company that had taken interest in his Stanford research called Quest Pharmaceuticals. A Canadian company, Quest reached out to Joe and funded the patent process to patent IgE Antibodies for the Inhibition of Tumor Metastases, patent number US 9,587,032 B2, issued March 7, 2017. Joe was thrilled and felt some measure of recognition. He bought 400,000 shares of Quest stock anticipating that his idea would take off and bring in massive profit, but this never happened. Quest seemed to have patented the idea and then let it stagnate. Once again, Joe was left disappointed.

### e. Personal Life

For most of his life, Joe put too much of himself into his work to maintain any romantic relationships. At one point in 2015 while at Stanford, however, he fell in love with a physician's assistant and proposed to her on a trip to Southern California. She accepted but the relationship

1   was rocky.  Both in their forties, Joe thinks they mutually saw one another as the "last train out of

2   the station" and argued frequently—so much so that Joe was afraid for them to move in together.

3   Eventually, they called off the engagement after a big fight.  Joe remained bitter that she walked

4   away with some of his belongings and an expensive engagement ring.

5        In the years since his failed engagement, Joe has gone on dates with adult, professional

6   women but never found the right match.  With season tickets to the Berkeley Repertory Theater

7   and a major fan of the opera and symphony, these were frequent venues for Joe's dates.  Before

8   the Covid-19 pandemic, Joe also went to shows with close female friends and sometimes alone.

9   Never having been interested in sports, he remarks that he has had few close male friendships over

10  the years.

11       Joe admits that he has tended to dwell heavily on his perceived failures.  He is convinced

12  that his idea for treating cancer remains groundbreaking but overlooked by those not yet ready for

13  it.  Asked why he was interested in cancer research to begin with, Joe explains that when Paul

14  McCartney's wife got breast cancer, he was struck by how she was still going to die despite

15  receiving the best available care.  Joe says he understood that Paul McCartney, and others like

16  him, would have given him all the money in the world for a cure.  Joe wanted to be the one to

17  deliver that cure.  He wanted to be both rich and famous but feels like he has become neither.

18  Instead, Joe feels lonely and disaffected.

19       Joe began using pornography as a way to assuage his loneliness while a young man.  In the

20  early 1980s he discovered online pornography and later used internet sites to collect what he

21  describes as tasteful, erotic pictures of adult women.

22       As Joe felt increasingly alone and defeated, he continued using pornography to try and

23  distract from his negative feelings.  When those feelings became especially intense, only

24  increasingly intense pornography seemed to help.  This is the trend in behavior that led to the

25  instant offense.

26

27

28

SENTENCING MEMORANDUM
CASE NO. 3:21-CR-00452

### f. Reflections and Regrets

Though now living in what he describes as a "world of regret," Joe emphasizes that he never participated in the creation of any illegal images or participated in illegal acts off-screen. As a result of his behavior, Joe has lost his job and his medical license, and reports experiencing intense self-loathing. He is reflecting on why he did what he did, is forthcoming about his failures, and is hoping to make changes in his life that address the underlying causes of what occurred.

### III. Sentencing Guidelines Discussion

The United States Sentencing Commission was charged by Congress with the task of establishing guidelines that would carry out the basic sentencing objectives contained in 18 U.S.C. § 3553(a). *See United States v. Rita*, 127 S.Ct. 2456, 2463 (2007). Those objectives include, *inter alia*, "certainty and fairness," avoiding unwarranted sentencing disparities, and permitting "individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." *Ibid*. The primary tool used by the Commission in creating the Sentencing Guidelines, the product of its Congressional mandate, was extensive and thorough examination of empirical data that included "tens of thousands of sentences." *Id*. at 2464; *see also United States v. Gall*, 128 S.Ct. 586, 594 (2007) (acknowledging that the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions").

An extensive and thorough evaluation of empirical data is *not*, however, how the Sentencing Commission has been forced to set the Guidelines for charges of possession of child pornography. *See generally* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (July 3, 2008), https://www.ussc.gov/sites/default/files/pdf/training/annual-national-training-seminar/2016/report_stabenow.pdf. The following is a brief summary of the history of the Guidelines as they relate to child pornography, which is described in far greater detail in Mr. Stabenow's article.

In 1990, Congress for the first time criminalized the possession of child pornography, and thereafter the Commission proposed to set a base offense level of 10 pursuant to § 2G2.4 for possessing, receiving, and transporting such material.  The base offense level for trafficking in child pornography had been set several years earlier at 13 pursuant to § 2G2.2.  *Id*. at 4-5.  Shortly thereafter, Senator Helms of North Carolina, under intense pressure from religious groups, proposed an amendment to the Treasury-Postal Service Appropriations Bill of 1991 that directed the Sentencing Commission (1) to expand greatly the category of crimes that fell under § 2G2.2 to include not only trafficking, but also receiving and transporting child pornography (which the Commission had deemed analogous to possession rather than trafficking); (2) to increase the base offense level under § 2G2.2 from 13 to 15; and (3) to increase the base offense level for § 2G2.4, which would cover only simple possession under the new law, from 10 to 13.  *Id*. at 6-9.  The amendment passed along with the unrelated legislation to which it was attached.

In 1995, Congress again directed the Sentencing Commission to modify the Guidelines as they related to child pornography; this time, it mandated an increase of the base offense level under § 2G2.2 from 15 to 17, with a new 2-level increase for the use of a computer, and it increased the base offense level under § 2G2.4 from 13 to 15 with the same computer-related increase.  In response to the new increases, the Commission commented that there was little to no distinction between simple possession cases and simple receipt cases, because material that is possessed must at some point be received, and it expressed concern that the crimes were treated separately under the Guidelines under §§ 2G2.2 and 2G2.4.  *Id*. at 15-16.

In 2003, Congress, without receiving comment from the Sentencing Commission, passed the PROTECT Act, which (1) added to the Guidelines large offense-level increases related to the number of images of child pornography, and (2) set mandatory minimum prison sentences.  *Id*. at 18-20.  In 2004, in response to the PROTECT Act, the Commission merged § 2G2.4 into § 2G2.2, and, *inter alia*, increased the base offense level of the now-expanded § 2G2.2 from 17 to 18.  It did so not on the basis of empirical study or analysis but, rather, in order to ensure that the Guidelines ranges corresponded to and exceeded the new mandatory minimums set by Congress.  *Id*. at 19-

21.  These provisions remain in substance today.  In essence, with respect to child pornography cases such as the instant case, Congress has completely relieved the Sentencing Commission of its authority and mandate to set fair and just sentences based upon careful study and research.

A similar abrogation of the Commission's authority and mandate was addressed by the Supreme Court in *Kimbrough v. United States*, 128 S.Ct. 558 (2007).  At issue in *Kimbrough*, of course, was the Guidelines' disparate treatment of crack- and powder-cocaine convictions, which the Court noted was derived by the Commission not through the preferred method of empirical analysis but, rather, as a result of Congressional direction.  *Id*. at 567.  Mr. Kimbrough pled guilty to several charges relating to the distribution of crack cocaine, and his Guidelines range was 228 to 270 months, with a statutory minimum prison term of 15 years.  *Id*. at 559-560.  The district court sentenced Mr. Kimbrough to the statutory minimum largely on the basis of its disagreement with the Guidelines' treatment of crack cocaine, and its finding that, under § 3553(a), any greater sentence would not accomplish the statute's goals.  With respect to the latter finding, the court noted that Mr. Kimbrough had no criminal history and had a long record of steady employment.  With respect to the former, the district court rejected the Sentencing Guidelines on the following basis:

> Congress established the Commission to formulate and constantly refine national sentencing standards. Carrying out its charge, the Commission fills an important institutional role: It has the capacity courts lack to base its determination on empirical data and national experience, guided by a professional staff with appropriate experience. . . The crack cocaine Guidelines, however, present no occasion for elaborative discussion on this matter because those Guidelines do not exemplify the Commission's exercise of its characteristic institutional role. In formulating Guidelines ranges for crack cocaine offenses, as we earlier noted, the Commission looked to the mandatory minimum sentences set in the 1986 Act, and did not take account of empirical data and national experience.

*Id*. at 574-75 (internal citations and quotations omitted).  The Supreme Court upheld the trial court's sentencing decision and the bases therefor.

*Kimbrough* was the first explicit acknowledgement by the Supreme Court that, in some areas, Congress has impeded the Sentencing Commission's mandate to construct fair and just Guidelines.  The defense submits that it has certainly done so in child pornography cases.  Mr. Mollick respectfully requests that this Court view the Sentencing Guidelines in this case with the

- 9 -

1  same skepticism as did the district court in *Kimbrough*, as the same deficiencies exist in the

2  Guidelines' treatment of child pornography cases as the court highlighted with respect to crack-

3  cocaine cases.

4  **IV.     18 U.S.C. § 3553(a)**

5          This Court must consult the Sentencing Guidelines in considering a fair and just sentencing

6  for Mr. Mollick, but it should be guided primarily by the factors enumerated in 18 U.S.C. §

7  3553(a).  *United States v. Gall*, 552 U.S. 38 (2007).  In light of *Kimbrough*, and the lack of

8  empirical or reasoned basis for the Guidelines as they relate to child pornography, the Court

9  should view the Guidelines range – 78 to 97 months, in this case – with skepticism.  Pursuant to §

10  3553(a), this Court must fashion a sentence that is sufficient but not greater than necessary to

11  comply with the statute.

12          Under § 3553(a)(1), the Court should give weight to Mr. Mollick's history and character,

13  as well as the nature and circumstances of the offense.  Prior to the conduct giving rise to this case,

14  Mr. Mollick lived a productive and crime-free life.  Mr. Mollick was a dedicated research scientist

15  and hospitalist who cared deeply about his patients and devoted many years to finding a cure for

16  cancer.  According to the independent medical evaluation performed by forensic psychiatrist Dr.

17  John Greene, Mr. Mollick's results on the Violence Risk Appraisal and Sex Offender Risk

18  Appraisal assessments indicate that he is at a low risk for committing sexual offenses in the future.

19  While the circumstances of the offense are egregious, there is no evidence or allegation that Mr.

20  Mollick has ever harmed, touched, or even approached a child in an inappropriate manner.

21          Section 3553(a) also directs the Court to impose a sentence that reflects the seriousness of

22  the offense and provides just punishment.  The discussion in Section III is relevant to this analysis.

23  The defense urges the Court to reject any notion of punishing Mr. Mollick for the undeniably

24  horrific nature of child pornography generally; that is, the creation of images depicting terrible

25  sexual abuse of real children.  Mr. Mollick did not produce any image depicting actual children

26  engaging in sexually explicit conduct, nor is there any allegation that he has ever acted

27  inappropriately with a child.  Pursuant to *United States v. Williams*, 553 U.S. 285 (2008), and

28

1   *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), this Court should consider only the harm

2   that is inflicted upon any real child depicted in the images on Mr. Mollick's computer by his

3   viewing of the image.  It is that marginal added harm to the child's reputation and emotional well-

4   being, *Free Speech Coalition*, 535 U.S. at 249, which flows from Mr. Mollick's viewing of the

5   image, rather than subjective moral or ethical judgments concerning the child pornography

6   industry or the terrible damage that it inflicts upon the vulnerable children it ensnares, that is

7   properly before this Court in its determination of the seriousness of Mr. Mollick's offense.

8         Mr. Mollick is remorseful for his behavior and now understands that children were

9   victimized in the making of the images on his computer, and he regrets his actions.  His criminal

10  conduct was an isolated incident in his life, and there is little risk that he will re-offend.  Further,

11  Mr. Mollick's medical license was suspended after his arrest, and as a result, he is unable to

12  engage in the work to which he has dedicated his life.  The defense submits that, pursuant to §

13  3553(a), a reasonable, just, and appropriate sentence for Mr. Mollick is a term of imprisonment of

14  24 months.  Although this sentence is below the range recommended by the Guidelines, it

15  comports with the statutory factors that this Court must consider.

16  **V.     Objection to Restitution**

17        Based upon the defense's review of the victim impact statements, it anticipates that the

18  government will be filing a formal request for restitution.  Although it is premature to make a

19  formal objection at this time – because the defense has not had the opportunity yet to review the

20  government's formal restitution request – the following discussion outlines the legal principles

21  upon which Mr. Mollick will base his objection if the government files a request for restitution.

22        The statute under which the government and victims seek restitution — 18 U.S.C. § 2259

23  — has a long, troubled history in courts, particularly as it relates to mere possession of child

24  pornography.  *See, e.g., United States v. Chow*, 760 F. Supp. 2d 335, 342 – 43 (S.D.N.Y. 2010)

25  (citing numerous cases for the proposition that the majority of courts have concluded that

26  proximate cause cannot be established in child pornography possession cases); *United States v.*

27  *Loreng*, 956 F. Supp. 2d 213, 224 – 28 (D.D.C. 2013) (addressing government's proposed

28

1    restitution calculation and concluding that this "unprincipled formula" leaves the court no "non-

2    speculative basis for awarding restitution"); *United States v. Kennedy*, 643 F.3d 1251, 1265 (9th

3    Cir. 2011) ("Although our sister circuits have also struggled with th[e] issue [of the 'difficulty . . .

4    in establishing the proper amount of restitution in cases involving offenses such as possession' of

5    child pornography], no court has yet developed a method for calculating a restitutionary award

6    under § 2259 that comports with the statutory language."); *United States v. Tallent*, 872 F. Supp.

7    2d 679, 688 (E.D. Tenn. 2012) (citing to law review article that states that "[h]olding defendants

8    in possession cases responsible for harm they did not cause via expansive proximate cause

9    analyses and dubious restitution calculations is not only legally erroneous; it may also be

10   unconstitutional").

11          Although many cases rejecting restitution to victims of child pornography possession

12   preceded *Paroline*, which purported to address some of the issues lower courts had in applying

13   this statute, the Supreme Court's opinion falls far short of resolving the issues arising out of

14   restitution requests in cases involving simple possession of child pornography.  *See, e.g., United

15   States v. DiLeo*, 58 F. Supp. 3d 239, 244 – 45 (E.D.N.Y. 2014) ("Bluntly, the Court finds itself

16   among the growing throng of district courts which 'have expressed their concern with the lack of

17   precise guidance from Congress and the Supreme Court in deciding restitution awards in these

18   circumstances.'"); *United States v. Baslan*, No. 13 CR 220(RJD), 2015 WL 1258158, at *4

19   (E.D.N.Y. Mar. 17, 2015) (reviewing the "frustration" that trying to follow the restitution

20   assessment instructions set out in *Paroline* has proven to be for district courts); *United States v.

21   Ayer*, No. 2:15-cr-86-APG-NJK, 2015 WL 7259765, at *2 (D. Nev. Nov. 17, 2015) ("While the

22   *Paroline* factors offer some guidance, the practical application of those factors is extraordinarily

23   difficult."); *United States v. Galan*, 804 F.3d 1287, 1291 (9th Cir. 2015) (referring to task of

24   disaggregating original abuse as no "more impossible than the other tasks imposed upon courts

25   attempting to apportion restitution amounts in this area," and stating that this area of law "cries out

26   for a congressional solution").  Nor does *Paroline* absolve the government of needing to meet the

27   requirements set forth by in that case where it simply lists whichever factors appear in *Paroline's*

28

1   holding at which it can easily arrive, ignores the rest, and then arrives at a final result entirely

2   divorced from the *Paroline* "analysis."  These types of "calculations" appear to be no different

3   from the types of arbitrary numbers offered by prosecutors prior to *Paroline* and usually rejected

4   by courts.

5          For instance, prior to *Paroline*, lower courts frequently rejected restitution requests where

6   the monetary requests were overly-speculative or entirely arbitrary.  *See, e.g., Kennedy*, 643 F.3d

7   at 1265 (rejecting government's offering of a "reasonable" number without explanation as

8   "precisely the type of arbitrary calculation" that the 9th Circuit has rejected and is not authorized

9   under § 2259); *Tallent*, 872 F. Supp. 2d at 693 (denying government's motion for restitution in

10  child pornography possession case because "the Court cannot fall back on speculation to

11  determine an appropriate amount of restitution" in the absence of evidence linking defendant to

12  victim's losses).  *Paroline* makes clear that courts should still order restitution "in an amount that

13  comports with the defendant's relative role in the causal process that underlies the victim's general

14  losses" where "it is impossible to trace a particular amount of [defendant's outstanding] losses to

15  the individual defendant by recourse to a more traditional causal inquiry."  134 S. Ct. at 1727.

16  Notably, however, this does not eliminate many of the fundamental requirements regarding

17  restitution, such as that it have some basis in the victim's alleged losses and, as *Paroline* explicitly

18  specifies, that it actually comports with the defendant's relative role in causing these damages.

19  *See, e.g., United States v. Darbasie*, 164 F. Supp. 3d 400, 406 (E.D.N.Y. 2016) ("*Paroline*, as

20  observed earlier, does not disturb the essential nature of restitution—a remedy designed to compel

21  the criminal to make his victim whole"); *United States v. Barry*, 647 Fed. Appx. 519, 524 (6th Cir.

22  2016) (finding that *Paroline* likely would not have permitted district court to add a punitive award

23  "unlinked to the defendant's causal role in the victim's losses").  Thus, to the extent the

24  government's request seeks restitution from Mr. Mollick that does not solve these issues, neither

25  *Paroline* nor any other case can save its claim.  *See United States v. Berk,* 666 F. Supp. 2d 182,

26  187 (D. Me. 2009) ("Congress did not relax the preexisting limitation that a crime victim may

27  recover in restitution only those losses caused by specific conduct for which defendant is

28

**SENTENCING MEMORANDUM**
**CASE NO. 3:21-CR-00452**

convicted"); *United States v. Chow*, 760 F. Supp. 2d 344 (S.D.N.Y) ("The Court understands the desire to award these victims some restitution, but the rule of reasonableness does not permit courts to impose a random restitution amount.").

## VI.      Request for Self-Surrender

Upon sentencing, Mr. Mollick respectfully requests that the Court allow him to self-surrender on a date that the Court deems appropriate.

Here, the Probation Office in the Final Presentence Investigation Report recommends that this Court, in its discretion, permit Mr. Mollick to self-surrender.  The conduct giving rise to this case was an aberration, and Mr. Mollick is not a danger to anybody, including himself.  Prior to the subject offense, Mr. Mollick lived a crime-free life, and, more importantly, there has never been an allegation that Mr. Mollick has had any inappropriate contact with minors, or that he has made any direct or indirect threats to anyone.

Further, Mr. Mollick is not a flight risk.  He has been a resident of the Bay Area for more than two decades and currently owns a home in Menlo Park.  Mr. Mollick has fully cooperated with the investigation and has made every court date.  Mr. Mollick remains under the supervision of Pretrial Services.

Based upon the foregoing facts, Mr. Mollick requests that this Court permit him to self-surrender on a date the Court deems appropriate.

## VII.     Conclusion

For the foregoing reasons, Mr. Mollick requests, through his attorneys, that this Court sentence him to a term of imprisonment of 24 months and impose a fine that it deems appropriate.

DATE: May 17, 2023                               Respectfully submitted,


                                                 */s/ Daniel Olmos*
                                                 Daniel Olmos
                                                 Attorney for Defendant Joseph Mollick

**SENTENCING MEMORANDUM**
**CASE NO. 3:21-CR-00452**